**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JERRY WAYNE MOONEY, #1322889,**[1] | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **3:05-CV-1432-N** |
| | ) | **ECF** |
| **DALLAS COUNTY, ET AL.,** | ) | |
| **Defendants.** | ) | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b), and an order of the District Court filed on October 30, 2007, this case has been referred to the United States Magistrate Judge. The findings, conclusions and recommendation of the Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS:

Type of Case: This is a fee paid civil rights action brought by a pre-trial detainee pursuant to 42 U.S.C. § 1983. While Plaintiff was initially represented by retained counsel, he is presently proceeding *pro se*.

Parties: At the time of filing this action, Plaintiff was incarcerated at the Dallas County Jail, where the events at issue in this case took place. Following his conviction, he was transferred to the Texas Department of Criminal Justice -- Correctional Institutions Division (TDCJ-CID). He is presently confined at the Powledge Unit of TDCJ-CID in Palestine, Texas.

The remaining Defendants are Dallas County and the Dallas County Hospital District (DCHD), which runs Parkland Memorial Hospital (Parkland) in Dallas, Texas.

---

[1] It has come to the Court's attention that Plaintiff's first name (Jerry) may not be spelled correctly. The offender information available on the Texas Department of Criminal Justice website and the state court's docket sheets reflect Plaintiff's first name as "Gerry."

<u>Statement of Case</u>:  On October 21, 2002, Plaintiff was involved in a shoot out with members of the Irving Police Department.  During the incident Plaintiff shot and injured at least two police officers, and suffered several gunshot wounds to his abdomen and legs, and a fractured femur.  As a result of the gunshot wounds and femur fracture, Plaintiff underwent emergency medical care at Parkland including the following life saving surgeries – i.e., a mid-line celiotomy, a colostomy, a surgery to correct his fractured femur, a debridement to correct a partial abdominal wound dehiscence, and a skin graft to his abdomen.  (Amd. Compl. at 6).  He remained hospitalized at Parkland for over one month, from October 22 until November 29, 2002.

Upon his discharge, he was transferred to the Dallas County Jail, awaiting disposition of the criminal charges stemming from the October shoot out.  Throughout his incarceration at the Dallas County Jail, Plaintiff experienced medical and psychiatric conditions, which required extensive treatment both at Parkland and at the Dallas County Jail.  On September 23, 2005, he pled guilty to the offense of aggravated assault on a public servant while using or exhibiting a deadly weapon, for which he was sentenced to a forty-five-year term of  imprisonment.  *State v. Mooney*, No. F02-35420.  On October 5, 2005, he was transferred to TDCJ-CID.  His conviction and sentence were affirmed on direct appeal.  *Mooney v. State*, No. 05-05-01395-CR (Tex. App. -- Dallas, Dec. 13, 2006) (unpublished op.).

On July 19, 2005, Plaintiff, through retained counsel, filed this action alleging numerous claims of denial of medical and psychiatric care under the Fourteenth Amendment Due Process Clause.  He also alleged a violation of his speedy trial rights under the Sixth Amendment.  He sought compensatory and punitive damages.

2

Findings and Conclusions:  After the filing of the amended complaint, the District Court granted Plaintiff's retained counsel's motion to withdraw on November 2, 2006.  Presently pending are Plaintiff's *pro se* motions to amend the complaint, to appoint counsel, and to produce documents.  (Doc. #65, #66, #74 and #86).  Also pending are Dallas County's and DCHD's motions for Summary Judgment, and Plaintiff's response and cross motion for summary judgment.  (Doc. #68, #72 and #75).[2]

## A.  Dismissal of Time Barred Claims

Plaintiff complains of numerous events that occurred during his pre-trial confinement at the Dallas County Jail between November 29, 2002, and October 5, 2005.  The lengthy delay between Plaintiff's arrival at the Dallas County Jail on November 29, 2002, and the filing of his complaint on July 19, 2005, prompts consideration of the timeliness of some of his claims.  *See* 28 U.S.C. § 1915A(a) and (b).  Although Defendants do not challenge the timeliness of Plaintiff's claims, the Court has the authority to raise that issue while fulfilling its screening function in fee-paid, prisoner complaints.  *See Martin v. Scott*, 156 F.3d 578 (5th Cir. 1998) (the statutory screening provision under § 1915A applies to all prisoners' actions against governmental entities, their officers and employees, regardless of whether the prisoner is proceeding *in forma pauperis*).  Section 1915A provides in pertinent part that:

> The court shall review . . . as soon as practicable after docketing, a complaint in a
> civil action in which *a prisoner* seeks redress from a governmental entity or
> officer or employee of a governmental entity [and] [o]n review, the court shall
> identify cognizable claims or dismiss the complaint, or any portion of the

---

[2]　　It appears that David D. Davis, Plaintiff's former, retained counsel in this case, was not involved with Plaintiff's state criminal proceedings, and his alleged need for medical care throughout his pre-trial detention.  Bruce Anton and A. Handley represented Plaintiff before the trial court.  Bruce Anton also represented Plaintiff on direct appeal.

complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(a) and (b) (emphasis added). *See Combs v. City of Dallas*, 3:06-CV-0074-P, 2006 WL 3635357, *2-3 (N.D. Tex. -- Dallas Div., 2006) (dismissing fee-paid, prisoner case as time barred under § 1915A(b)(1)).

In Texas, § 1983 actions are governed by the two-year personal injury limitations period. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)*; Stanley v. Foster*, 464 F.3d 565, 568 (5th Cir. 2006); *Piotrowski v. City of Houston*, 51 F.3d 512, 514 n.5 (5th Cir. 1995); Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon Supp. 2007).

Under the facts alleged in this case, all claims predating July 19, 2003, two years before the filing of the complaint, are barred by the two-year statute of limitations. None of Plaintiff's pleadings indicate that he was unaware of the injuries on which these claims are based, or that the two-year limitations period should otherwise be tolled. Therefore, Plaintiff's claims predating July 19, 2003, are untimely and should be summarily dismissed.

B. Motions for Summary Judgment
and Plaintiff's Motion to Appoint Counsel

To prevail on a motion for summary judgment, the moving party has the initial burden of showing that there is no genuine issue of any material fact and that judgment should be entered as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10 (1986). The materiality of facts is determined by substantive law. *Anderson,* 477 U.S. at 248, 106 S. Ct. at 2510. An issue is "material" if it involves a fact that might affect the outcome of the suit under governing law. *Burgos v. Southwestern Bell Telephone Co.,* 20 F.3d

633, 635 (5th Cir.1994).  Once the moving party has made an initial showing, the party opposing

the motion for summary judgment may not merely rely on his pleadings, but must come forward

with competent evidentiary materials that establish a genuine fact issue. *Anderson,* 477 U.S. at

256-257, 106 S.Ct. at 2514; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 585-87, 106 S.Ct. 1348, 1355-56 (1986).  The court must resolve any factual

controversies in favor of the non-moving party.  *Richter v. Merchants Fast Motor Lines, Inc.,* 83

F.3d 96, 98 (5th Cir. 1996).

## 1. Medical and Psychiatric Care Claims[3]

To state a colorable claim under the Eighth Amendment for denial of medical care,

convicted inmates must allege acts or omissions "sufficiently harmful to evidence a deliberate

indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285

(1976); *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997).  "Deliberate indifference

encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of

mankind." *Norton*, 122 F.3d at 291.  It occurs when a prison official subjectively knows of and

---

[3]      Exhaustion of administrative remedies under 42 U.S.C. § 1997e(c), is mandatory
before the filing of any suit challenging prison conditions.  *Woodford v. Ngo*, ___ U.S. ___, 126
S.Ct. 2378, 2382-83 (2006) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Booth v.
Churner*, 532 U.S. 731, 741 (2001)).  Plaintiff alleges that most of his attempts to file grievances
were unsuccessful, that he was never informed that any investigation or action was taken in
response to his grievances, that he received no response to the few grievances filed, and that he
was unaware of his appeal rights.  (*See* Amd. Comp. at 23 and 27, and Pl's Response and Cross
Mot. for Sum. Judg. at 1).  Thus, it is unclear whether any failure to exhaust administrative
remedies was due to Plaintiff's own inaction or to some impediment caused by the Dallas
County Jail.  Nevertheless, the Court may dismiss or deny a claim without first requiring
exhaustion of administrative remedies.  *See* 42 U.S.C. § 1997e(c)(2) ("In the event that a claim
is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or
seeks monetary relief from a defendant who is immune from such relief, the court may dismiss
the underlying claim without first requiring the exhaustion of administrative remedies).

disregards a substantial risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837-840 (1994).

The same standard applies to pre-trial detainees complaining of an "episodic act or omission" under the Due Process Clause of the Fourteenth Amendment. *Wagner v. Bay City, Tex.,* 227 F.3d 316, 324 (5th Cir.2000); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996). "[T]here is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care. *Gibbs v. Grimmette,* 254 F.3d 545, 548 (5th Cir. 2001).[4]

Delays in providing medical care do not give rise to a constitutional violation unless the deliberate indifference of the medical staff results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993); *see also Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006). Additionally disagreements as to the correct pharmaceutical regimen and/or medical or psychiatric treatment do not constitute cognizable civil rights claims, but at most, possible claims of medical malpractice appropriately addressed under state law. *E.g. Estelle*, 429 U.S. at 107-108; *Norton*, 122 F.3d at 292; *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979); *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

Moreover, it is well settled that relief is unavailable under § 1983 for claims grounded

---

[4]     Plaintiff's complaint does not raise an attack under the Fourteenth Amendment on the general conditions of confinement at the Dallas County Jail. *See Hare v. City of Corinth, Miss.*, 744 F.3d 633, 638-39 (5th Cir. 1996) (en banc) (in a condition of confinement case, the constitutional challenge is to the "general conditions, practices, rules, or restrictions of pre-trial confinement"); *Palo v. Dallas County*, 3:05cv0527-D, 2007 WL 2140590, *2-5 (N.D. Tex. 2007) (Fitzwater, J.) (examining in detail standard for conditions of confinement claim).

only in negligence. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986); *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).

In support of its motion for summary judgment, Dallas County relied on the affidavit of Walter Skinner, MD, who is employed as the Associate Medical Director at the Dallas County Jail. Dr. Skinner reviewed Plaintiff's medical records, consisting of 1,145 pages of medical records from the Dallas County Jail, and 1,257 pages of medical records from DCHD. (*See* Dallas County's Appx. at Exh. 4). Dr. Skinner concluded that the Dallas County Jail medical staff did not deliberately or recklessly ignore Plaintiff's serious medical and psychiatric needs, and that "the medical care provided to the plaintiff during his confinement in the Dallas County Jail was reasonable, adequate and consistent with the standard of care of other correctional facilities in the State of Texas." (*Id.*). DCHD submitted Plaintiff's medical records from his four initial surgeries, and the evaluations and tests conducted at Parkland during his confinement at the Dallas County Jail. (*See* DCHD's Appx.).

Where questions regarding medical care are present, it is readily apparent that expert opinion informs any decision as to whether genuine issues of fact exist with regard to the quality of care provided – particularly in the context of constitutional violations – in all but the most egregious circumstances where there is a total absence of care. Plaintiff has failed to present any competent expert testimony controverting the affidavit of Dr. Skinner or any expert opinion calling into question the treatment provided at Parkland and at the Dallas County Jail as set out in the records submitted. As noted above, a party may not merely rely on his pleadings (the allegations in his amended complaint) to demonstrative the existence of genuine issues of fact,

7

but is required to come forward with competent evidentiary materials. *Anderson*, *supra*, 477 U.S. at 256-57, 106 S. Ct. at 2514. Since Plaintiff has failed to raise any genuine issues of fact as to whether either Defendant was deliberately indifferent to serious medical needs, *e.g. Norton*, *supra*, 122 F.3d at 291, Dallas County and the Dallas County Hospital District are entitled to summary judgment, dismissing Plaintiff's medical and psychiatric claims with prejudice.

Although Plaintiff's original and amended complaints were filed by his retained counsel, he has been proceeding *pro se* since his former attorney was granted leave to withdraw. He has not retained new counsel and has requested that the court appoint an attorney, initially on May 31, 2007, and subsequently on August 22, 2007. A civil rights complainant has no right to the automatic appointment of counsel, although the court may appoint counsel when exceptional circumstances are presented. *See e.g. Akasike v. Fitzpatrick*, 26 F.3d 510, 512 (5th Cir. 1994).

In exercising the court's discretionary authority in determining whether appointment of counsel is warranted in this case, the undersigned requested that Dallas County provide all of the medical records compiled while Plaintiff was confined as an inmate at the Dallas County Jail from approximately November 29, 2002, until he was transferred to TDCJ-CID on October 5, 2005 – *the same records reviewed by Dr. Skinner*. While it is doubtful that an inmate plaintiff is capable of self-representation in an action involving medical treatment and expert testimony, *see* the factors enumerated in *Ulmer v. Chancellor*, 691 F.2d 209, 212 (5th Cir. 1982), it does not follow that merely because medical testimony and records are relevant that this fact renders every civil rights action alleging deliberate indifference to serious medical needs one in which exceptional circumstances are present. For example, as *Estelle v. Gamble*, *supra*, teaches a claim which gives rise only to one involving medical malpractice fails to constitute a cause of

action cognizable under § 1983.

Having meticulously reviewed the voluminous medical records, the magistrate judge concludes that Plaintiff cannot establish deliberate indifference to serious medical or psychiatric needs. It is abundantly clear that Plaintiff received a formidable array of medical and psychiatric care, prescription medications, medical supplies, and tests at no charge. In addition to the four initial surgeries, which undoubtedly saved his life, Plaintiff's medical and psychiatric conditions continued to be monitored and treated for nearly three more years at Parkland and at the Dallas County Jail. Plaintiff's amended complaint boils down to assertions of delay in receiving medical care, disagreement with the type of care received, and negligent medical care.

The undersigned considers it appropriate to address the claims asserted in Plaintiff's amended complaint *seriatim* to demonstrate that the medical records establish *at most* the presence of medical malpractice or negligence, neither of which rises to the level of a constitutional violation. The allegations in Plaintiff's amended complaint are not evidence and in fact many of the claims asserted and discussed *infra* are in direct contradiction to the medical records submitted by Dallas County.[5]

a. Plaintiff's medical condition deteriorated in the Summer 2003

By the Summer of 2003, Plaintiff's weight ballooned from 150 pounds in October 2002, to approximately 230 pounds, and his general medical condition deteriorated with increased

---

[5]     The records contained in the DCHD appendix foreclose the possibility of any cause of action against the hospital district and therefore, the magistrate judge addresses only those episodic incidents alleged to have occurred in the county jail.
        The magistrate judge will refer to the Dallas County Jail Medical Records as "DCJ Med. Rec." Dallas County mailed to Plaintiff a copy of the cover letter submitted along with the medical records. As a result, Plaintiff is on notice that the medical records have been submitted to the court for review.

body swelling, difficulty breathing, and chest pains by August 2003. (Amd. Compl. at 16). In August, Plaintiff also developed a fistula with drainage into his colon. (*Id.* at 17). In September, Plaintiff allegedly experienced delay in receiving a diuretic, and the jail received an outside complaint requesting that Plaintiff be seen for his swollen face. (*Id.* at 18).

Apart from mental health records, the jail medical and medication records for the summer of 2003 are sparse. On June 25, 2003, a doctor checked Plaintiff's breathing, and his abdominal support. (DCJ Med. Rec. at 265). The medication records include only records for June, August, and November 2003. In July 2003, Judge Francis, the presiding judge in his pending criminal case, ordered that Plaintiff be brought to Parkland for evaluation. In compliance with the court order, Plaintiff was taken to Parkland and seen by several physicians on August 1, 2003. (*Id.* at 1019, 1021, 1023). According to the amended complaint, Plaintiff underwent cauterization of portions of his stoma, additional medications were provided, and a new surgery was scheduled. (Amd. Compl. at 17). On September 5, 2003, he also underwent a colostomy study at Parkland. (DCJ Med. Rec. at 280).

This is not a case in which Plaintiff was denied medical attention altogether. His own pleadings concede that his conditions were being monitored by Parkland and the jail medical staff. Therefore, to the extent that there may have been episodic instances in which swelling and breathing difficulties were not monitored by jail staff, only negligence omissions are alleged.

Plaintiff also complained of delay in receiving a diuretic, allegedly for the increased body swelling. Delay in providing medical care does not give rise to a constitutional violation unless the deliberate indifference of the medical staff results in substantial harm. *Mendoza*, 989 F.2d at 195. Plaintiff's complaint is silent as to any substantial harm that he may have suffered as a

result of the delay in receiving the diuretic.

Moreover, in response to Plaintiff's criminal defense attorney's request for an immediate physician visit, Plaintiff's condition was evaluated the very next day, September 27, 2003. The Clinic Notes for September 27, 2003, reflect Plaintiff's criminal defense attorney had called twice, and was very demanding. (DCJ Med. Rec. at 489). Plaintiff's main complaint related to body pain. (*Id.*). His wound, however, looked fine, his chest was clear, and the colostomy was operating. (*Id.*). Plaintiff's allegation that the doctor was abusive and denied him access to phones does not rise to a constitutional violation.

b. Failure to inform of medication and fasting requirement in August 2003, and failure to transport to Parkland in November 2003

On August 20, 2003, Plaintiff was scheduled to have a barium enema at Parkland, but he was not informed of the medications and fasting requirements by Dallas County jail staff. (Amd. Compl. at 17). As a result, the procedure could not be performed.

This occurrence amounted at most to negligence. An appointment for the barium enema was rescheduled; Plaintiff was taken to Parkland on Sept 5, 2003, and a CT scan was performed. (DCJ Med. Rec. at 280). Insofar as Plaintiff alleges that he was not informed of the test results until December 26, 2003, the same fails to present a cognizable § 1983 claim

In November 2003, Plaintiff asserts that he was not taken to Parkland for an appointment. (Amd. Compl. at 19). The jail medical records do not reflect a scheduled appointment at Parkland in November 2003. If such an appointment was made, the absence of any notation in Plaintiff's jail records and/or the failure to have him transported to Parkland constitutes at most a negligent omission.

c. Transfer to Infirmary and Denial of Medical Care in November and December 2003

On November 3, 2003, Plaintiff's criminal defense attorney wrote a letter stating that Celexa was the only medication that had ever helped Plaintiff's depression and that, since it had been discontinued, Plaintiff was very depressed. The letter further reported that Plaintiff did not benefit from Wellbutrin, and that the absence of Neurontin was a problem because Plaintiff was becoming increasingly anxious and agitated. The letter acknowledged, however, that no generic was available for Neurontin. (DCJ Med. Rec. at 821). On November 5, 2003, a consultative examination was requested. (*Id.* at 998). On November 7, 2003, Plaintiff's criminal defense attorney orally requested a physical and mental evaluation by a doctor at the jail. (Amd. Compl. at 19). On the same date, Dr. Flanigan evaluated Plaintiff's abdomen, requested a consultative examination at Parkland, including a CT scan of his abdomen, and referred Plaintiff's case to the psychiatric department for evaluation. (DCJ Med. Rec. at 259, 488, 490, 873, 990, 1069, 1130). Dr. Flanigan also ordered that Plaintiff be transferred from the West Tower to the infirmary, where he remained throughout the remainder of his incarceration at the Dallas County Jail. (*Id.* at 818). On November 11-14, 2003, Plaintiff was seen in the clinic for back pain and nausea complaints (*Id.* at 492), and the physician issued orders and medications (*Id.* at 260). Blood test were also taken and results were received. (*Id.* at 708).

Plaintiff underwent a mental status exam on November 20 and December 3, 2003. (DCJ at 271-72, 816). He complains, however, that the psychiatrist could not correct the administration of his medications, apparently because some medications were non-formulary. On December 11, 2003, the medical department received a kite from Plaintiff requesting that the Wellbutrin dosage be corrected to what the doctor had ordered. (*Id.* at 84). The kite was addressed on December 13, 2003, but the response is not included with the medical records. (*Id.*

at 85). Plaintiff was given another mental status exam on December 24, 2003. (*Id.* at 92, 751, 797).

The above allegations do not present a deliberate indifference claim regarding Plaintiff's medical and psychiatric care. Insofar as Plaintiff disagrees with the type of psychiatric medications that he was receiving while confined at the Dallas County Jail, his claim fails to rise to a constitutional violation. As noted above, such disagreements as to the correct medication and/or medical treatment do not constitute an actionable civil rights claim, but at most, a possible claim of medical malpractice appropriately addressed under state law. *E.g. Estelle*, 429 U.S. at 107-108; *Norton*, 122 F.3d at 292.

The complaint alleges that on one occasion in November 2003, Plaintiff had to use the same colostomy bag for eleven days. The medical records reflect Plaintiff was given colostomy supplies on November 21, 22, and 29, 2003. (DCJ Med. Rec. at 260, 263, 493). Thus, any delay in receiving colostomy supplies amounted at the most to negligence.

On December 13, 2003, Plaintiff developed a lesion at the graft site. During the next month and one-half, the jail nurses cleaned the area and applied dressing, Bactrim was started for fourteen days, and a culture of the wound was undertaken. (*Id.* at 86, 171, 226, 574-78, 579-590). On December 22, 2003, Plaintiff's criminal defense attorney called complaining that Plaintiff had increasing nausea and difficulty urinating. Plaintiff was evaluated by the nurse the same day. On December 23, 2003, he was prescribed Zantac to address the nausea complaint, although no active vomiting had been observed or reported. (*Id.* at 40-41, 147-49, 855). These allegations do not raise a claim of deliberate indifference to a serious medical need.

Nor did the confiscation of Plaintiff's blanket, stool softners and abdomen support binder

during a jail "shake down" on January 25, 2004, rise to deliberate indifference. (Amd. Compl. at 20). It is conceded that on February 3, 2004, his mother brought a new abdomen support binder and stoma supplies to the jail. (*Id.*). Stool softeners were also provided by the medical department. *See* May 6, 2004 response to Kite #40495. (Dallas County's Mot. for S.J. at Attach. 2).

Similarly, any claim related to Plaintiff's fall on March 4, 2004, does not allege a colorable claim of deliberate indifference to a serious medical need. This claim is conclusory and fails to provide any details from which deliberate indifference might be inferred.

d. <u>Not receiving medications in December 2003 and January 2004</u>

On December 30, 2003, Plaintiff complained of not receiving his medications, although his chart reflected that nine different medications were prescribed. Although there were no problems noted, the medications were reordered just in case. (DCJ Med. Rec. at 15, 145, 199). On December 31, 2003, Dr. Reid reviewed Plaintiff's chart. He noted that Plaintiff was manipulative and called his criminal defense attorney who in turns called the jail to complain about medical care, when in fact Plaintiff was well attended for in the jail. (*Id.* at 37, 117, 144, 763).

On January 10, 2004, Plaintiff's criminal defense attorney allegedly tried to get a phlebotomist into the jail to test Plaintiff without success. On February 24, 2004, it appears the phlebotomist was permitted to test Mooney, who allegedly concluded that Plaintiff was not receiving medications. (Amd. Compl. at 20).

It is unclear from the medical records whether Plaintiff received his medications in December 2003 and January 2004. While six medications are listed on the December 2003

medications record, the date on which the medications were administered was left blank. (DCJ Med. Rec. at 310-11). The medical records do not include the medications record for January 2004. However, the Clinic Notes from January 10 and January 13, 2004, reflect Plaintiff was taking nine medications. (*Id.* at 82 and 35). Moreover, the medications records for the month of February 2004, reflect that Plaintiff was receiving nine medications on a daily basis. (*Id.* 324-25). These medications were continued, with a few exceptions, throughout the remainder of Plaintiff's incarceration at the Dallas County Jail.[6]

In light of this, the alleged denial of medications in December 2003 and January 2004 does not rise to the level of deliberate indifference.

e. <u>Psychiatric Medications</u>

The focus of Plaintiff's allegations is that he should have been receiving non-formulary psychiatric medications while confined at the Dallas County Jail. Plaintiff's mental condition allegedly responded only to Celexa instead of Wellbutrin, which was available at the jail. He also allegedly needed a higher dosage of Neurontin.

On March 30, 2004, Dr. Oliver interviewed Plaintiff for 1 ½ hours pursuant to Judge Francis's request (DCJ Med. Rec. at 29) and submitted a psychiatric evaluation (*Id.* at 98, 135, 196). On April 8, 2004, Dr. Oliver examined Plaintiff again and noted that his mental illness

---

[6] The jail medication records are as follows: November and December 2002 (DCJ Med. Rec. at 306-09); January, February, March, April, June, August, November, and December 2003 (*Id.* at 294-303, 310-13, and 356-360); February, March, April, May, June 2004 (*Id.* 314-325, 353, 361-373); July, August, September, October 2004 (*Id.* 336-342, 394, 396-405); November and December 2004 (*Id.* at 332-35, 388-92, 395); January 2005 (*Id.* 330-31, 386-87); March 2005 (*Id.* 326-329, 350-52, 380-81, 383-85); May 2005 (*Id.* 343-44, 374, 406); June 2005 (*Id.* 348-49, 378-79); July 2005 (*Id.* 345-346, 375-76); August 2005 (*Id.* 347, 377).

was under treatment and relatively stable, and that he was receiving his medications.  (*Id.* at 23-25, 122, 773-775).  On the same date, Dr. Oliver attended a court hearing regarding Plaintiff's psychiatric medications.  (*Id.* 26, 776).  His notes reflect that Judge Francis would be writing an order regarding Plaintiff's psychiatric medications which would possibly restart Celexa and increase the dosage of Neurontin.  (*Id.*).

As noted above, prior to on or about April 8, 2004, Plaintiff was medicated with Wellbutrin primarily because other prescription drugs had no generic counterparts or were not included in the jail formulary.  Any claim that Celexa and a higher dosage of Neurontin were better suited for the treatment of his psychiatric problems raises a medical malpractice issue rather than a cognizable constitutional violation.

f.  <u>Delay in receiving colostomy bags, Neurontin, and rash cream</u>

In late April 2004, Plaintiff claims to have begun having trouble receiving colostomy bags and Neurontin.  (Amd. Compl. at 21).  He alleges that on May 21, 2004, his cell mates allegedly threatened to file complaints against him because of the smell from his colostomy bag and body odor and he was placed in solitary confinement.  (*Id.* at 21).

The medical records do not contain any notation referring to colostomy supplies or denial/delay thereof in April 2004.  On May 4, 2004, the Mental Health Clinc evaluated Plaintiff and noted that his appearance was neat and appropriate (DCJ Med. Rec. at 96, 123, 194, 255-57).  Absent is any mention of body odor or smell from the colostomy bag.  (*Id.*).  On May 7, 2004, Plaintiff's mother brought to the jail an abdominal binder, stoma adhesive paste, and odor eliminator drops.  (*Id.* at 67, 177, 178, 238).  The binder was given to Plaintiff, while the paste and deodorant drops were placed in the examination room until the next day when the doctor

authorized their use.  (*Id.* at 66, 176, 125, 240, 770).  Plaintiff was seen in the infirmary for various maladies on May 10, 2004 (*Id.* 00017-18, 768-69), and was given colostomy supplies, including paste, the following day.  (*Id.* 65, 184, 241).  He was also placed on the nurse list to receive colostomy supplies every three days as requested.  (*Id.*).  The medical records reflect Plaintiff received colostomy care supplies on May 17 and 26, as well as June 1, 4, 16, 19, and 22.  (*Id.* 607-09, 610-12).

Since the delay in receiving colostomy care supplies appears to have been only temporary, it would not amount to deliberate indifference.  Likewise, it appears that delay, if any, in receiving Neurontin (Amd. Compl. at 21) was also temporary.  The medical records reflect that Plaintiff received Neurontin twice daily from February through June 2004.  (DCJ Med. Rec. at 314-325, 353, 361-373).  The dosage, however, decreased from 600 mg. to 400 mg. on or about May 18, 2004, when Plaintiff's chart was reviewed and the amount of Neurontin was checked.  (*Id.* 158, 786; for medications records *see id.* at 316-317, 319).

The amended complaint further alleges a delay in receiving a medicinal cream for a rash that had developed over Plaintiff's face and head during the last several months.  (Amd. Compl. at 21).  The medical records reflect that on May 10, 2004, Plaintiff was seen in the infirmary for various issues, including a "dry scaley rash on nasal folds  and beard," and selenium sulfide was ordered.  (DCJ Med. Rec. at 17-18, 768-69).  Any delay in receiving treatment for the facial rash did not rise to deliberate indifference to a serious medical need

g.  Erroneous release from jail and delay in receiving medications and medical supplies

The medical records are silent as to why Plaintiff was erroneously released from custody on June 25, 2004.  Nevertheless any claims arising from this accidental release, and the

misspelling of his name upon his return to the jail on June 28, 2004, rise at the most to negligence. (DCJ Med. Rec at 680-84 for copy of Central Intake Evaluation Form). On June 29, 2004, Plaintiff was transferred from the West Tower -- where he had been initially assigned -- to the infirmary. His family brought to the infirmary his medications and colostomy supplies, and Plaintiff was given his colostomy supplies that afternoon. (*Id.* at 63, 182, 243).

Insofar as Plaintiff complains of delay in receiving medications as result of his erroneous release, his claim fares no better. The medical records reflect that he received his medications in June and July 2004. (*Id.* at 315-16, 341). He underwent a mental health screening on July 14, 2004. (*Id.* at 270). While he may not have been receiving Neurontin as of July 20, 2004 (*Id.* at 93, 191-93, 252-54), it was restarted within the next four days. (*Id.* at 49, 157, 827, 908).

h. Inadequate medical care from January 2005 throughout Spring 2005

In 2005, Plaintiff alleges the jail conditions did not improve, medical care remained inadequate, and his physical and mental condition continued to deteriorate. (Amd. Compl. at 23). Plaintiff's family allegedly began a second letter writing campaign in January 2005. (*Id.*).

With respect to his mental condition, the medical records reflect Plaintiff's mental health condition continued to be monitored. On January 28 and 31, 2005, his mental status was evaluated and Loxapine was started. (DCJ Med. Rec. at 0099, 197, 251, 277). On January 31, 2005, Dr. Reid issued a long written evaluation. (*Id.* at 734-39). A mental status exam was conducted on February 22, 2005 (*Id.* at 279, 861-62, 733), his lithium level was tested on March 30, 2005 *(Id.* 00091, 190, 249, 698)*, and a psychiatric evaluation was completed on June 21, 2005 (*Id.* 749, 858). There were no changes in medications. (*Id.*). The August 2, 2005 Mental Health Clinic Notes reflect that Plaintiff felt he was doing well with his current medications,

although Prozac was not as effective as Celexa. The doctor, thus, increased Proxac to two capsules. (*Id.* at 7, 100, 198, 258).

The jail medical department continued to monitor Plaintiff's physical condition as well. In response to his complaint of mid to low back pain, Darvocet and Methocarb were started on February 25, 2005. (DCJ Med. Rec. at 42, 159). The Clinic Notes for March 18, 2005, indicate Plaintiff wanted pain medications again; otherwise, he was doing fine, the skin integrity looked good although still very protruding; Methocarb was started for one week. (*Id.* at 160). Plaintiff continued to complain of abdominal pain, and the nurse requested that his chart be reviewed on April 16, 2005. (*Id.* at 161). On May 4, 2005, Plaintiff was evaluated for pain in his abdomen and back. The abdominal exam was unchanged, and the colostomy was functioning. He was prescribed Darvocet for 10 days. (*Id.* at 53, 175, 216, 592). In late May, Plaintiff again complained about back, abdominal and hip pain, and requested that Darvorcet be reissued. (*Id.* at 13, 189, 250). Plaintiff renewed his complaint in June. The June 23, 2005 Clinic Notes reflect that no action was taken because he had an appointment at Parkland on June 24, 2005. (*Id.* at 62, 170, 219). The August 20, 2005 Clinic Notes state that Naproxen was ordered in response to Plaintiff's hip and back pain. (*Id.* at 11, 55, 163, 220 )

In addition to his mental and physical condition, Plaintiff complained of not receiving colostomy supplies. The medical records reflect that in response to Grievance #51961 (received June 2, 2005) about not receiving colostomy bags, the nurse directed that colostomy bags be issued when the offender needs them. (DCJ Med. Rec. at 16, 200). On August 5, 2005, the nurse handed colostomy supplies to Plaintiff in his tank, and informed him that he should notify the nursing staff when more supplies were needed. (*Id.* at 591, 623). Plaintiff also received

colostomy care supplies on August 13, 20, and 23, 2005.  (*Id.* at 620-622).

In light of the above, Plaintiff's general complaints of denial of medical care fail to establish deliberate indifference to serious medical conditions.

i.  Delay in Providing Surgeries for Hernia Repair and Colostomy Reversal

Plaintiff  alleges that the hernia repair and colostomy reversal surgeries were and are still medically necessary.  He relies on the fact that he was evaluated at Parkland on April 16 and 26, 2004, and on both occasions he was scheduled for surgery on July 29, 2004.   (Amd. Complaint at 21).

The colostomy was as a result of the wounds he suffered in the shootout with police on October 21, 2002.  It is unclear whether the hernia was a pre-existing condition, or also a result of the shooting incident.  Plaintiff concedes that the contemplated surgeries were elective rather than medically necessary.  (Amd. Compl. at 22).  His medical records fully corroborate this assessment.

On numerous occasions after Plaintiff's initial surgeries, he was examined and treated by various physicians at Parkland Hospital.  Plaintiff was examined on April 18, 2003, and it was determined that he was not ready for a colostomy closure, that he should be seen in three months, and that an abdomen binder be ordered.  (DCHD's Appx. at 75).  On August 1, 2003, Plaintiff's stoma was cauterized, medications were provided, and a new surgery date was scheduled pending improvement of his physical condition.  (*Id.* at 80).  On September 5, 2003, Plaintiff underwent a colostomy study, and on September 13, 2003, he was examined at Parkland.  (*Id.* at 81 and 85).  A CT scan of his abdomen followed on December 5, 2003.  (*Id.* at 86-87).  On April 16, 23, and 26, 2004, Plaintiff was again examined at Parkland.  (*Id.* at 55-56, 66-68).  The April

16, 2004 evaluation specifically reflects that Plaintiff's surgeries were elective and not surgically required. Dr. Garza, the evaluating physician, specifically noted that Plaintiff "will require an extensive operation for his ventral hernia *electively if desired*. He will also need takedown of his colostomy prior to ventral hernia repair *if desired*. Plastic surgery service will need to assist in closure of his abdomen, but only after colostomy is taken down. He also needs a barium study of his colon/rectum prior to takedown of his stoma." (DCJ Med. Rec. at 1060, 1109, and 1122) (emphasis added).

Plaintiff argues that Dallas County failed to take him to Parkland for the July 29, 2004 surgeries, and provided him only with follow-up evaluations at Parkland in September and October 2004, and again in April 2005. (*Id.* at 22 and 23). The July 29, 2004 Clinic Notes reflect that Plaintiff's elective surgeries were postponed when he was mistakenly released from custody on June 25, 2004, which caused all his previous appointments to be cancelled. (DCJ Med. Rec. at 88-90, 185, 187, 244-45).

Plaintiff's hernia was evaluated next on September 17, 2004, and his colostomy was evaluated on October 18, 2004. (DCHD's Appx. at 53-54, 32-24 and 86). Plaintiff concedes that on October 18, 2004, he was advised that his surgeries were elective. (Amd. Complaint at 22). On April 4, 2005, he was again examined at Parkland and an electrolyte panel was performed. (DCHD's Appx. at 47-48). On June 24, 2005, Plaintiff was examined and referred to a plastic surgeon. (*Id.* 15, 17). On July 7, 2005, the plastic surgeon informed Plaintiff that he had to lose weight before he could undergo surgery, and a follow-up appointment was recommended after three months. (*Id.* at 8).

Although Plaintiff was in custody of the Dallas County Jail for approximately 34 months,

the medical records show that he was not medically ready for those two elective surgeries throughout his period of confinement. While he was scheduled for surgery on July 29, 2004, it was postponed due to his mistaken release from custody – a circumstance wholly unrelated to his existing medical condition. Upon his re-incarceration his situation was monitored, resulting in a determination that he lose weight before rescheduling the surgery. The surgeries were ultimately scheduled at Parkland for October 26, 2005, but he was transferred to the custody of the TDCJ-CID for service of his forty-five year sentence on October 5, 2005.

Plaintiff has failed to demonstrate that delay in performing the surgeries in question amounted to deliberate indifference to his serious medical needs.

In summary, the Dallas County Jail medical records strongly refute Plaintiff's pleadings that the County's nurses, employees and doctors were deliberately indifferent to serious medical needs. Despite the fact that he was represented by retained counsel for more than one year, following the filing of the complaint in this action, Plaintiff has not presented even a scintilla of evidence, nor a hint of an expert's opinion that his medical care while confined was so deficient in quality as to present a colorable claim that it violated his constitutional rights. Therefore, he has failed to demonstrate that his suit presents exceptional circumstances which warrant the appointment of counsel.

Accordingly, Defendants motions for summary judgment should be granted on the medical and psychiatric claims, and Plaintiff's motions for appointment of counsel and cross motion for summary judgment should be denied.

## 2. Speed Trial Claim

Next Plaintiff alleges that Defendants' actions and inactions with respect to his medical

and psychiatric needs contributed to a denial of his Sixth Amendment right to a timely criminal trial. (Amd. Compl. at 30-31). An alleged violation of a criminal defendant's right to a speedy trial does not state a cause of action under § 1983. Moreover, Plaintiff's plea of guilty to the aggravated assault charge waived all non-jurisdictional defects. *See Tollett v. Henderson*, 411 U.S. 258, 93 S. Ct. 1602 (1973). Therefore, Defendants' motions for summary judgment should be granted on this claim as well.

C. Plaintiff's Motions to Amend and to Produce

In his *pro se* motion to amend, filed May 31, 2007, Plaintiff seeks leave to add as defendants the Texas Department of Criminal Justice (TDCJ) -- in whose custody he has been confined since October 2005 -- and the University of Texas Medical Branch (UTMB), alleged to be the provider of medical services to TDCJ inmates. Plaintiff's claims against TDCJ and UTMB about his ongoing need for medical care and reconstructive surgeries is beyond the scope of this action. His motion to amend should be denied, but without prejudice to Plaintiff's filing a complaint in the Eastern District of Texas, where he is presently confined, in the event he has yet to receive hernia repair and colostomy reversal surgeries.

The granting of Defendants' motions for summary judgment renders moot Plaintiff's motion for production.

RECOMMENDATION:

For the foregoing reasons, it is recommended that Defendants' motions for summary judgment (Doc. #68 and #72) be GRANTED, and that Plaintiff's cross motion for summary judgment (Doc. #75) be DENIED.

It is further recommended that Plaintiff's motion to amend (Doc. #65) be DENIED

without prejudice to Plaintiff's filing a complaint in the Eastern District of Texas, where he is presently confined, in the event he has yet to receive hernia repair and colostomy reversal surgeries. Plaintiff's motions to appoint counsel and to produce documents (Doc. #66, #74, and #86) should be DENIED.

A copy of this recommendation will be mailed to Plaintiff and counsel for Defendants.

Signed this 4th day of December, 2007.

_____
WM. F. SANDERSON, JR.
UNITED STATES MAGISTRATE JUDGE

<u>NOTICE</u>

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten days after being served with a copy of this recommendation. Pursuant to *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten-day period may bar a *de novo* determination by the district judge of any finding of fact or conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.